UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN GREINER,

      Plaintiff,                            Case No. 14-cv-13979
                                            Hon. Matthew F. Leitman

v.

CHARTER COUNTY OF
MACOMB, MICHIGAN, a/k/a
MACOMB COUNTY, et al.,

      Defendants.
_____/

**ORDER (1) GRANTING AFSCME'S MOTION FOR SUMMARY
JUDGMENT (ECF #90); (2) DENYING WITHOUT PREJUDICE
AFSCME'S REQUEST FOR SANCTIONS; (3) GRANTING IN PART AND
DENYING IN PART WITHOUT PREJUDICE MACOMB COUNTY'S
MOTION FOR SUMMARY JUDGMENT (ECF #89);
AND (4) DENYING PLAINTIFF'S MOTION FOR RECONSIDERATION
REGARDING AUDIO TAPES (ECF #115)**

During Plaintiff John Greiner's tenure as an employee of Defendant Charter

County of Macomb (the "County"), he had an unsatisfactory safety and behavior

record. He caused and/or was involved in several vehicle accidents, was

insubordinate with his superiors, and had conflicts with co-workers. Greiner and the

County ultimately entered into a Last Chance Agreement that provided for

termination of his employment upon any additional act of negligence or

insubordination, and the County later fired him for additional misconduct. His union

1

had the right to seek arbitration based upon his termination, but it declined to do so on the ground that his termination was justified.

Greiner then filed this action (and others, both civil and administrative) challenging his termination. He retained three separate attorneys to represent him, and all three were forced to withdraw as counsel due to breakdowns in the attorney-client relationship – fissures that were caused by, among other things, Greiner's refusal to follow their advice and his repeated accusations that they were lying and committing misconduct. Perhaps unsurprisingly, Greiner has been unable to find a fourth lawyer to represent him, and he is now proceeding pro se.

The Defendants have moved for summary judgment, and Greiner has responded. Greiner's responses are deficient in many respects. They are difficult to follow; they ignore several of the Defendants' key arguments and rely upon inadmissible evidence; and they fail to demonstrate that there is a material factual dispute with respect to any of Greiner's claims against Defendant Michigan Council 25 American Federation of State, County, and Municipal Employees, AFL-CIO ("AFSCME" or the "Union") and the vast majority of Greiner's claims against the County. Thus, for the reasons explained below, the Court **GRANTS** in full the motion for summary judgment filed by the Union and **GRANTS IN PART AND DENIES IN PART WITHOUT PREJUDICE** the County's motion for summary

judgment.[1]   The Court also **DENIES WITHOUT PREJUDICE** the Union's request for sanctions and **DENIES** Greiner's motion for reconsideration regarding audio tapes (ECF #115).

# I

## A

On or around November 13, 2000, the County hired Greiner to work for the Macomb County Road Commission (the "MCRC"). (*See* Greiner Dep. at 37, ECF #89-2 at Pg. ID 1010.)  The County fired Greiner on November 7, 2012. (*See id.* at 148, ECF #89-2 at Pg. ID 1037; *see also* Termination Letter, ECF #89-26.)  While employed by the County, Greiner was a member of the Union. (*See* Greiner Dep. at 58, ECF #89-2 at Pg. ID 1015.)

## B

During Greiner's tenure with the MCRC, he received a number of reprimands and suspensions for his careless and unsafe operation of county vehicles.   For example, in January 2003, the MCRC revoked Greiner's driving privileges after he backed his truck into another truck. (*See* Greiner Dep. at 39-40, ECF #89-2 at Pg. ID 1010.)  In a written explanation of the revocation, MCRC's personnel director wrote that Greiner "does not work in a safe manner" and that Greiner's co-workers

---

[1] The Court has determined that it is appropriate to decide Defendants' motions for summary judgment without oral argument. *See* Fed. R. Civ. P. 78(b); E.D. Mich. L.R. 7.1(f)(2).

"are reluctant to work with him because they fear for their safety." (Revocation Letter, ECF #89-5.) Greiner completed a defensive driving course in May 2005, and the MCRC then agreed to reinstate his driving privileges "on an as needed basis." (Greiner Dep. at 44, ECF #89-2 at Pg. ID 1011.)

In October 2005, MCRC promoted Greiner to the position of highway maintenance leader. (*See id.* at 45, ECF #89-2 at Pg. ID 1012.) Then, in May 2007, the MCRC awarded Greiner the position of heavy truck driver. (*See id.* at 46-47, ECF #89-2 at Pg. ID 1012.) In its memorandum formally offering Greiner that position, the MCRC wrote that "due to [Greiner's] past history, the road commission reserves the right to review [his] performance at any time and take remedial action deemed necessary." (*Id.*)

In December 2007, the MCRC cited Greiner for causing significant damage to a county truck by backing up onto an arrow-board. (*See id.* at 48, ECF #89-2 at Pg. ID 1012.) Less than two weeks later, Greiner received a warning for driving with the dump box of his vehicle too high and pulling down a cable wire. (*See id.* at 49, ECF #89-2 at Pg. ID 1013.) In April 2009, Greiner received another warning for pulling into a service garage with his dump box in the upright position, striking an aluminum siding overhang, and pulling a large piece off the building. (*See id.* at 49-50, ECF #89-2 at Pg. ID 1013.)

The damage caused by Greiner's carelessness behind the wheel reached its peak on December 8, 2009. That day, Greiner drove a MCRC truck through a red light and hit the driver's side of a vehicle driven by Fred Vaden. (*See* Greiner Dep. at 51, ECF #89-2 at Pg. ID 1013; Sheriff's Report, ECF #90-4 at Pg. ID 1496-97.) The accident caused "heavy damage" to Vaden's vehicle. (Sheriff's Report, ECF #90-4 at Pg. ID 1496-97.) Vaden suffered a fractured left leg and "need[ed] to be extracted from the vehicle." (*Id.*)

Greiner received a ticket for "disobey[ing] a traffic control device." (Certification of Court Disposition, ECF #90-4.) Greiner was ultimately held responsible for a reduced traffic infraction of "speeding 1-5" miles per hour over the speed limit. (*Id.*) Vaden later sued the County and Greiner. (*See* Greiner Dep. at 53, ECF #89-2 at Pg. ID 1014.) The County settled the suit by paying Vaden $380,000 in exchange for full release of Greiner and the County of any further liability. (*See id.*)

## C

Immediately following the December 8, 2009, accident, MCRC placed Greiner on paid administrative leave while the County investigated his role in the accident. (*See id.* at 54, ECF #89-2 at Pg. ID 1014.) Greiner returned from administrative leave on February 3, 2010. (*See id.* at 57, ECF #89-2 at Pg. ID 1015.) That day, Greiner and his union representative signed two memoranda of

understanding (the "First and Second MOUs") and a Last Chance Agreement (the "LCA"). (*See id.* at 57-58, ECF #89-2 at Pg. ID 1015.)

In the First MOU, Greiner agreed to serve "a 20 day unpaid disciplinary lay-off" and then return to work as a highway maintenance person in MCRC's Sign Department. (First MOU, ECF #90-6.) Greiner also agreed that "for the balance of his employment" he would "not . . . operate a[n] [MCRC] vehicle or equipment of any type." (*Id.*)

In the LCA, Greiner agreed that "[a]ny further acts of negligence, insubordination, or unsafe activity on [his] part shall be cause for his immediate discharge form [sic] employment with the [MCRC]." (LCA, ECF #90-7.)

In the Second MOU, Greiner agreed that he could only file a grievance challenging the terms of the First MOU and LCA if he was "found not guilty of all charges related to [the December 8, 2009,] vehicle accident." (Second MOU, ECF #90-5.)

In March 2010, Greiner completed his 20-day suspension and was assigned to work as a highway maintenance person in MCRC's Sign Department, as required by the First MOU. (*See* Greiner Dep. at 78-80, ECF #89-2 at Pg. ID 1020; *see also* Second Am. Compl. at ¶64, ECF #46 at Pg. ID 413.)

**D**

While Greiner worked as a highway maintenance person in the Sign Department, he repeatedly informed the MCRC that he needed work restrictions because of his health problems.

On March 23, 2010, Greiner presented his supervisor with a document from his (Greiner's) personal physician, Dr. Keith McKenzie, stating that Greiner was unable to lift more than twenty pounds. (*See id.* at 80, ECF #89-2 at Pg. ID 1020.) Because there was no light duty work (i.e. work that required lifting no more than twenty pounds) available within the Sign Department, Greiner went home and did not work. (*See id.* at 78-80, ECF #89-2 at Pg. ID 1020.) In lieu of working, Greiner received workers' compensation. (*See id.*)

Greiner presented the MCRC with additional notes from Dr. McKenzie that put him off work from April 22, 2010 through June 3, 2010, due to his health problems. (*See* McKenzie Notes, ECF ## 90-15, 90-16, 90-17.) In one of the notes, Dr. McKenzie also specified that Greiner continued to need work restrictions, including not lifting more than twenty pounds, no stooping, crawling, or climbing, and no standing or walking for longer than four hours. (*See* McKenzie Note for May 21, 2010, ECF #90-17.)

On June 1, 2010, Greiner attended an independent medical examination with Dr. Maynard Buszek. Dr. Buszek cleared Greiner to return to work without

restrictions. (*See* First Buszek Report, ECF #90-18 at Pg. ID 1559-60.)  But rather than return to work, Greiner used personal sick and vacation time to delay his return. (*See* Greiner Dep. at 81, ECF #89-2 at Pg. ID 1021.)

While on sick/vacation leave, Greiner secured another note from Dr. McKenzie that stated that Greiner could not lift more than twenty pounds, stoop, climb, crawl, or stand or walk for more than four hours. (*See* McKenzie Note for June 21, 2010, ECF #90-19.)  According to Greiner, these restrictions "*remained in effect throughout the remainder of [his] employment*" with the MCRC. (*See* Greiner Dep. at 81, ECF #89-2 at Pg. ID 1021; emphasis added.)

Greiner returned to the Sign Department on July 23, 2010. (*See id.*)  In November 2010, Greiner saw Dr. Buszek for a second independent medical examination. (*See* Second Buszek Report, ECF #90-21.)  Dr. Buszek concluded again that Greiner could work without any limitations or restrictions. (*See id.* at Pg. ID 1567.)  But Greiner continued to submit notes from his personal physicians stating that he could not lift more than twenty pounds, stoop, climb, crawl, or stand or walk more than three or four hours. (*See* Greiner Dep. at 88, ECF #89-2 at Pg. ID 1022.)

## E

As a highway maintenance person, Greiner's job duties were to perform manual labor, patch holes, flag traffic, sweep, dig, cut trees, install road signs and

guardrails, operate power tools, and perform related duties as assigned. (*See* Job Description, ECF #89-17.) In addition, Greiner was expected to lift at least fifty pounds. (*See* Job Expectations, ECF #89-18.)

Throughout Greiner's two and one-half years as a highway maintenance person in the Sign Department, the MCRC repeatedly reprimanded or disciplined Greiner for refusing to do work that fell within his job duties and/or for completing that work in an unsafe manner. Examples of the MCRC reprimanding Greiner for insubordination or carelessness in completing his duties include:

- On April 28 and 29, 2011, Greiner received verbal and written warnings for misusing sick time to avoid direct orders to fill sand bags. (*See* Greiner Dep. at 113-14, ECF #89-2 at Pg. ID 1029; *see also* Disciplinary Action Forms, ECF ## 90-28, 90-29.)

- On May 5, 2011, Greiner received a one-day suspension for failing to follow directions from his crew leader in preparation for their daily sign route. (*See* Greiner Dep. at 114-15, ECF #89-2 at Pg. ID 1029; *see also* Disciplinary Action Form, ECF #90-30.)

- On May 12, 2011, Greiner received another one-day suspension for injuring himself while operating a chainsaw with one hand and then failing to report the injury to his supervisors. (*See* Greiner Dep. at 116-118, ECF #89-2 at Pg. ID 1029-30; *see also* Disciplinary Action Forms, ECF ## 90-31, 90-32.)

- On June 20, 2012, Greiner was suspended after he refused his supervisor's request to put a jug of water into a dispenser. (*See* Greiner Dep. at 137, ECF #89-2 at Pg. ID 1035; Disciplinary Action Form, ECF #90-34.)

**F**

From July 2012 to October 2012, the County instituted three disciplinary proceedings against Greiner in connection with his continued insubordination and failure to perform his job duties. With each successive proceeding, the County disciplined Greiner with increased severity, culminating with the termination of his employment.

The County commenced the first disciplinary proceedings by sending Greiner a letter dated July 2, 2012, in which it informed Greiner that:

> [It] ha[d] conducted a review regarding allegations of [his] failure to perform job duties and insubordination as follows:
>
> - On June 7, 2012, [he] refused to assist in loading guard rail onto the trailer.
>
> - On or about June 11, 2012, [he] refused to assist in loading rail onto the trailer.
>
> - On or about June 13, 2012, [he] failed to work in a safe manner when [he] walked into traffic to carry posts from the front of the truck to the bed of the truck.
>
> - On or about June 20, 2012, [he] refused to replace the cooler water jug.
>
> Based on the information gathered, the County [was] considering disciplinary action up to and including discharge.

(*See* 7/2/12 Letter, ECF #90-35.)  The letter also notified Greiner that the County had scheduled a *Loudermill* hearing (the "First *Loudermill* Hearing") to "allow [him] to respond" to the allegations, and that he was "entitled to bring a representative of [his] choosing to this hearing." (*Id.*)[2]

At the First *Loudermill* Hearing, Greiner described his physical restrictions and responded to the allegations. (*See* Greiner Dep. at 138-139, ECF #89-2 at Pg. ID 1035.)  A union representative also spoke on Greiner's behalf. (*See id*. at 189-190, ECF #89-2 at Pg. ID 1066.)  After the First *Loudermill* Hearing, the County concluded that Greiner had been "insubordinate and [had] failed to perform [his] job duties." (7/16/12 Suspension Letter, ECF #90-36.)  Rather than terminating Greiner's employment, however, the County suspended him for three days. (*See id.*)

On July 30, 2012, Greiner's co-workers and supervisor reported that he had been "deliberately inefficient and incompetent in his duties installing signs.  He would not lift a four foot stub and when he did he was exceptionally slow." (Martin Balinski Decl., ECF #89-19 at Pg. ID 1204; *see also*, Disciplinary Action Form, ECF #90-37.)  After conducting an investigation into the July 30, 2012, incident, the County notified Greiner that it had scheduled another *Loudermill* Hearing (the

---

[2] A "*Loudermill* hearing" is a hearing that a public employer must typically conduct prior to terminating an employee who has a protected property interest in continued employment. *See Cleveland Bd. of Education v. Loudermill*, 470 U.S. 523, 545-46 (1985). (See Section V, *infra*, for a discussion of the constitutional requirements of a *Loudermill* hearing.)

"Second *Loudermill* Hearing") to allow him to respond regarding his co-workers' allegations. (*See* Greiner Dep. at 191, ECF #89-2 at Pg. ID 1066.) That notice specified that the Second *Loudermill* Hearing concerned allegations that Greiner "fail[ed] to place the post drive on the post, assemble signs, lift posts or stubs and get in and out of the bucket in a competent manner." (*See id.*)

Two union representatives spoke on Greiner's behalf at the Second *Loudermill* Hearing. (*See id.* at 195, ECF #89-2 at Pg. ID 1067.) In addition, Greiner told the County at the hearing that his co-workers were lying about his misconduct to retaliate against him for uncovering an overtime fraud scheme. (*See id.* at 142, ECF #89-2 at Pg. ID 1036.) After the Second *Loudermill* Hearing, the County suspended Greiner for ten days.

On September 26, 2012, Greiner's co-workers reported to the MCRC that Greiner has been insubordinate while flagging traffic that day. (*See* Balinski Decl., ECF #89-19 at Pg. ID 1204-05; *see also* September 26-27, 2012 Incident Fact Sheets, ECF #90-40.) Specifically, they claimed that he had been unresponsive on a two-way radio for up to five minutes, was argumentative with the project leader, Martin Balinski, regarding where to stand, and had placed crew members in an unsafe environment. (*See id.*) According to Greiner's supervisor, the situation on the road became so "chaotic" that the Sheriff's Department had to intervene. (*See* Sabaugh Dep., ECF #89-15 at Pg. ID 1165.) The next day, Balinski reported that

Greiner had refused a directive to help lift a guardrail onto a trailer. (*See* Balinski Decl., ECF #89-19 at Pg. ID 1204-05.)

After Greiner's co-workers reported the incidents on September 26 and 27, the County placed Greiner on paid administrative leave. (*See* 9/28/12 Letter, ECF #90-41.) In a letter dated October 11, 2012, the County notified Greiner that it had conducted an investigation into his alleged insubordination on September 26 and 27, 2012, and that it was "considering disciplinary action up to and including discharge." (10/11/12 Letter, ECF #90-42.) The letter also notified Greiner that the County had scheduled a *Loudermill* Hearing (the "Third *Loudermill* Hearing") for October 19, 2012, to allow him to respond to the allegations. (*See id.*) The letter informed Greiner that he was entitled to bring a representative of his choosing to this hearing. (*See id.*)

Two days prior to the Third *Loudermill* Hearing, Greiner formally reported to the County his belief that his co-workers were engaging in overtime fraud. (*See* Greiner Dep. at 198, ECF #89-2 at Pg. ID 1068.) At the hearing, Greiner reiterated that his supervisors and co-workers were fabricating reports of his misconduct in an effort to cover up their overtime fraud. (*See id.* at 147-48, ECF #89-2 at Pg. ID 1037.) In addition, Greiner presented evidence stating that it was proper for a traffic regulator to stand on the shoulder of the road. (*See id.* at 197-98, ECF #89-2 at Pg. ID 1068.) Union representative Paul Long also spoke on Greiner's behalf at the

13

hearing. (*See id.* at 146-47, ECF #89-2 at Pg. ID 1037.) Long argued to the County that Greiner had not refused orders and did as he was told. (*Id.*)

Following the Third *Loudermill* Hearing, the County terminated Greiner's employment. (*See* Termination Letter, ECF #89-26.) The decision was made by Robert Hoepfner, the Director of the Macomb County Department of Roads, based on the recommendation of Karen Bathanti, the Service Director for the Human Resources and Labor Relationship Department. (*See* Hoepfner Dep., at 15, ECF #89-27 at Pg. ID 1224; Bathanti Dep. Book II at 24, ECF #89-28 at Pg. ID 1319.) Bathanti investigated the allegations of Greiner's misconduct and ran the three *Loudermill* hearings. (*See* Bathanti Dep. Book II at 24, ECF #89-28 at Pg. ID 1319.)

## G

The Collective Bargaining Agreement (CBA) between the Union and the County allowed the Union to commence arbitration proceedings challenging Greiner's termination (*see* CBA at Article 9, ECF #90-2 at Pg. ID 1424-27), but it declined to do so. The Union communicated that decision to Greiner in a letter dated January 8, 2013, which explained that:

> The [Union found a] lack of evidence with which to refute the Employer's allegations and their application of progressive discipline. This is especially true when the "Last Chance Agreement" was signed on February 3, 2010.

(*Id.*)  The letter also informed Greiner that he could ask the panel to reconsider its decision by providing a written response and supporting evidence. (*See id*.)  Greiner submitted multiple rounds of responses and evidence, but the Union upheld its initial decision not to arbitrate his grievance. (*See* 2/7/13 and 5/17/13 Letters, ECF ## 90-46, 90-47.)

## II

## A

After Greiner was fired, he filed actions against the County and the Union in a variety of fora.  First, Greiner filed a lawsuit in Macomb County Circuit Court, in which he alleged that the County terminated his employment in violation of the Michigan Whistle Blower Protection Act, MCL § 15.362 et. seq. (See description of state court case in Greiner Discovery Plan, ECF #30 at Pg. ID 126-27.)  Greiner also filed an action against the County and the Union in the Michigan Employment Relations Commission (MERC). (*Id.* at 127.)  In the MERC action, Greiner charged that (1) the Union violated the Michigan Public Employment Relations Act (the "PERA") by breaching its duty of fair representation and acting in an arbitrary manner; and (2) the County violated the PERA because it "lacked good cause for terminating him." (*See* MERC Decision, ECF #90-49 at Pg. ID 1640.)  The MERC ruled against Greiner on both charges. (*See id.* at Pg. ID 1637-43.)

Finally, on October 15, 2014, Greiner, acting through attorney Leland Schmidt, filed this action against the County and the Union. (*See* ECF #1.)   On August 3, 2015, Schmidt filed a ten-count Second Amended Complaint on Greiner's behalf. (*See* ECF #46.)  Greiner later voluntarily dismissed Counts IV and VI of the Second Amended Complaint and voluntarily dismissed a portion of Count VII of the Second Amended Complaint. (*See* ECF #50.)

The eight counts that remain in this action are as follows:

**Count I:** Violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq. (the "ADA");

**Count II:** Violation of the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 et. seq. (the "PWDCRA");

**Count III:** Violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621 et. seq. (the "ADEA");

**Count V:** Due Process Violation and First Amendment Retaliation;

**Count VII:** Breach of Employment Contract;

**Count VIII:** Concert of Action;

**Count IX:** Civil Conspiracy; and

**Count X:** Intentional Infliction of Emotional Distress.

(*See* Sec. Am. Compl., ECF #46 at Pg. ID 460-83.)

**B**

Shortly after Greiner filed his Second Amended Complaint, he began having serious disagreements with Schmidt about the handling of his case. On October 2, 2015, Schmidt moved to withdraw as counsel on the ground that there had been a breakdown in his attorney-client relationship with Greiner. (*See* Schmidt Mot. to Withdraw, ECF #57.) The Court held a hearing on Schmidt's motion to withdraw on November 4, 2015. During the hearing, Schmidt explained that his relationship with Greiner broke down because, among other things, Greiner was using circular reasoning in their discussions concerning the proper strategy to pursue. The Court granted Schmidt's motion to withdraw and provided Greiner with 45 days to find new counsel. (*See* ECF #65.)

Greiner was unable to find an attorney within that time period. In a filing dated March 14, 2016, Greiner informed the Court that he had been in touch with multiple lawyers but none would take his case. (*See id.*) Greiner requested the Court to appoint him counsel. (*See* ECF #74.) In support of that request, Greiner attached portions of the undersigned's Senate Judiciary Committee Questionnaire and asserted a number of arguments that were difficult to comprehend. (*See id.*) The Court declined to appoint him counsel.

Greiner independently continued to look for counsel, and on April 14, 2016, Attorney Lance Mason agreed to take Greiner's case. (*See* ECF #76.)

**C**

On January 31, 2017, both the County and the Union moved for summary judgment. (*See* ECF ## 89, 90.)

Four days later, Mason filed an emergency motion to withdraw as Greiner's counsel. (*See* ECF #91.)  In the motion, Mason informed the Court that "[t]here had been a breakdown of the client-attorney relationship" and that it was "the desire of [Mason] to terminate his professional relationship with [] Greiner." (*Id.*)  Greiner opposed Mason's motion to withdraw by filing a brief that contained a number of arguments that were difficult to follow and a reference to the lyrics of the classic song *Hallelujah* by Leonard Cohen. (*See* ECF #97.)  The Court held a hearing on Mason's motion on March 1, 2017.

During the hearing, Greiner confirmed that Mason was the third attorney to withdraw from representing him in his dispute with the County.  Greiner explained that in addition to Schmidt and Mason, attorney David Kotwicki had withdrawn from representing him in the state court litigation against the County.  Like Schmidt and Mason, Kotwicki cited a breakdown in the attorney-client relationship that arose because, in Kotwicki's opinion, Greiner refused to follow his advice.  Also during the hearing, Greiner accused Mason of committing serious misconduct and revealed that he (Greiner) had filed a grievance against Mason with the Michigan Attorney Grievance Commission.

The Court granted Mason's motion to withdraw. (*See* ECF #99.) The Court also granted Greiner an extension to file responses to Defendants' motions for summary judgment. (*See id.*)

On April 14, 2017, Greiner filed *pro se* responses to Defendants' motions for summary judgment. (*See* ECF ## 103, 104.) The responses are often difficult to follow (one contains a single paragraph that runs eight pages) and ignore many of the Defendants' arguments. The responses also rely extensively upon inadmissible evidence, such as unverified transcripts of surreptitious recordings Greiner made of his co-workers, supervisors, and management.[3] (*See, e.g.*, Private Transcript of Audiotape Recording of Greiner's Conversations with Co-workers, ECF #103-2.) Defendants replied on May 4, 2017. (*See* ECF ## 107, 108.)

## III

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ." *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party

---

[3] The Court denied Greiner's motion to listen to the audio recordings and include them as part of the depositions. (*See* ECF #117.) The Court granted Greiner's motion to file in the traditional manner a flash drive containing the recordings to ensure that such recordings were part of the record in the event that Greiner later sought review of the Court's decisions in this case. (*See id.*)

and draw all reasonable inferences in its favor." *Id.* "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. Indeed, "[c]redibility determinations, the weighing of the evidence and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

## IV

In Counts I and II of the Second Amended Complaint, Greiner alleges that Defendants violated the ADA and PWDCRA by discriminating against him on the basis of his disability. (*See* Sec. Am. Compl. at ¶¶ 370-408, ECF #46 at Pg. ID 460-67.)

In relevant part, the ADA provides:

> No covered entity shall discriminate against a *qualified individual* on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. §12112 (emphasis added). Similarly, under the PWDCRA, "an employer shall not" "discharge or otherwise discriminate against an individual . . . because of

a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." M.C.L. §37.1202.

Greiner contends that Defendants violated the ADA and PWDCRA in two ways: (1) they failed to accommodate his alleged disability and (2) they terminated his employment because of his disability. The Court will analyze each theory of disability discrimination separately below.

**A**

**1**

To establish a prima facie case of failure to accommodate under the ADA or PWDCRA, an employee must show:

> (1) he is disabled within the meaning of the ADA [or PWDCRA]; (2) he is otherwise qualified for his position, … with or without accommodation; (3) the employer knew or had reason to know of his disability; (4) the employee requested an accommodation; and (5) the employer failed to provide a reasonable accommodation thereafter.

*Green v. BakeMark USA, LLC*, 683 Fed. App'x 486, 491 (6th Cir. 2017) (citations omitted).[4]

---

[4] "The PWDCRA 'substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, but not always, resolve the plaintiff's PWDCRA claim.'" *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir. 2002). Here, the parties do not distinguish between Greiner's ADA and PWDCRA claims in their briefs, and thus the Court will analyze the claims under a single standard.

If an employee establishes a prima facie case of failure to accommodate, "the burden shifts to the employer to demonstrate that any particular accommodation would impose an undue hardship on the employer." *Id.*

## 2

The County and Union are entitled to summary judgment on Greiner's failure to accommodate claims because Greiner has not shown that he was "otherwise qualified" for his position as a highway maintenance person.

"[A]n individual is 'otherwise qualified' if he or she can perform the 'essential functions' of the job with or without reasonable accommodation." *Keith v. County of Oakland*, 703 F.3d 917, 925 (6th Cir. 2013) (quoting 42 U.S.C. § 12111(8)). "A job function is 'essential' if its removal would 'fundamentally alter' the position." *Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001) (citation omitted). "Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015) (en banc) (citing 42 U.S.C. §12111).

If an employee contends that he can complete the essential functions of a job with "reasonable accommodation" from his employer, "the employee bears the burden of proposing an accommodation" that is reasonable. *Id.* at 763. "A reasonable accommodation may include 'job restructuring and part-time or modified work schedules.' But it does *not* include removing an 'essential function' from the

position, for that is *per se* unreasonable." *Id.* (internal citations and quotation marks omitted) (emphasis in original). In addition, an accommodation is unreasonable if it will "force employers to . . . create new jobs, displace existing employees, or violate other employees' rights under the collective bargaining agreement." *Steward v. Daimler Chrysler Corp.*, 533 F. Supp. 2d 717, 722 (E.D. Mich. 2008) (citing *Thompson v. DuPont deNemours & Co.*, 80 Fed. App'x 332, 336 (6th Cir. 2003).

Greiner has not shown that he can complete the essential functions of a highway maintenance person without reasonable accommodation. The County has presented ample evidence that the essential functions of a highway maintenance person include lifting heavy objects, climbing, and standing for long periods of time. Hoepfner, the director of the Roads Department with 42 years of experience, testified that a highway maintenance person is required to "lift more than 20 pounds," complete "overhead lifting," "climb," "squat," and "kneel." (Hoepfner Dep. at 5, 165-66, ECF #89-27 at Pg. ID 1222, 1262.) In addition, Hoepfner could not identify any jobs in the department that were "sedentary" or required standing less than three hours a day. (*Id.*) Hoepfner's testimony is corroborated by the published Job Description and Expectations of a highway maintenance person. That document states that a highway maintenance person duties include performing manual labor, sweeping, digging, installing road signs and guard rails, and being able to "lift at least 50 pounds." (Job Description and Expectations, ECF ## 89-17, 89-18.) Greiner

does not dispute that standing for long periods of time, climbing, and lifting heavy items were essential functions of his job as a highway maintenance person. (*See* Greiner Dep. at 66-67, 68, 73, 79, ECF #89-2 at Pg. ID 1017, 1019, 1020). And Greiner does not contend that he could have consistently completed these essential functions without accommodation.[5] (*See* Greiner's Resp. Br., ECF ## 103, 104.)

Instead, Greiner contends that he could have performed the essential functions of a highway maintenance person if the MCRC had provided "reasonable accommodation[s]." (*See* Greiner Dep. at 161, ECF #89-2 at Pg. ID 1041.) But none of Greiner's proposed accommodations are "reasonable." Greiner initially argues that the MCRC should have accommodated him by guaranteeing that his co-workers were always available to "help" whenever he needed to lift something heavier than twenty pounds. (*See id.* at 162, ECF #89-2 at Pg. ID 1041.) However, "[c]ourts have continuously found that employers are not required to assign existing employees or hire new employees to perform certain functions or duties of a disabled employee's job which the employee cannot perform by virtue of his disability." *Bratten v. SSI*

---

[5] Greiner could not plausibly claim that he could perform the essential functions without reasonable accommodations. Greiner's own physician, Dr. McKenzie, whose notes Greiner relies upon to show that he is "disabled," found that Greiner "could not lift more than 20 pounds, stoop, climb, crawl, or stand or walk more than four hours." (*See* McKenzie Notes, ECF # 90-15, 90-17, 90-19.)

*Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999). [6] Thus, Greiner's proposal that the County make others available to perform (or assist with) his duties is not a reasonable accommodation.

Next, Greiner asserts that the MCRC should have accommodated him by assigning him to work on the sign truck every day. (*See* Greiner Dep. at 110, 164, ECF #89-2 at Pg. ID 1028, 1041.) This proposed accommodation is unreasonable for two reasons. First, Greiner has not shown that the sign truck assignment would have been compatible with documented physical restrictions imposed by Greiner's own physician – i.e., (1) not lifting more than twenty pounds, (2) not climbing, and (3) not standing more than four hours per day. (*See* McKenzie Notes, ECF # 90-15, 90-17, 90-19.) Indeed, at his deposition, Greiner admitted that the sign truck assignment required both climbing and lifting more than twenty pounds. (*See* Greiner Dep. at 79, ECF #89-2 at Pg. ID 1020.) And when pressed, Greiner could not confirm that the sign truck assignment would have allowed him to avoid standing for longer than four hours per day. (*See* Greiner Dep. at 109, ECF #89-2 at Pg. ID

---

[6] Greiner says that for a period of time, his co-workers provided him with "unofficial" accommodations, such as not making him lift guardrails or tri-rails when he was on guardrail crew. (Greiner Dep. at 88-90, ECF #89-2 at Pg. ID 1022-23.) Greiner claims that the only reason his co-workers stopped helping him was to retaliate against him for exposing an alleged overtime fraud scheme. (*See id.*) However, Greiner cites no authority for the proposition that his co-workers' temporary decision to voluntarily assist him obligated the County to provide him such assistance going forward.

1028. [7]) Thus, Greiner's own testimony suggests that the sign truck assignment was incompatible with his own claimed medical restrictions. Greiner has not cited any authority that suggests that an employer must accommodate an employee by assigning him to a role that is inconsistent with the employee's own medical restrictions.

Second, the sign truck assignment is not a reasonable accommodation because it would have required the County to violate the rights of other employees. Greiner admitted that in order to permanently assign him to the sign truck, the County would have had to regularly assign "higher classified" employees to perform lower-classified "laborer" tasks that normally would have been completed by Greiner (the lowest classified employee in his department) had he not been limited to the sign truck. (Greiner Dep. at 110, ECF #89-2 at Pg. ID 1029.) Greiner contends that the CBA permitted the County to adopt such a policy. (*See id.*) Greiner's reading of the CBA is mistaken. Although the CBA permitted the County to assign an employee

---

[7] Greiner worked an eight-hour day, and his physician-imposed restrictions prohibited him from standing for more than four of those eight hours. Thus, as he acknowledged during his deposition, he needed a position that allowed him to sit for at least four hours per day. (*See* Greiner Dep. at 108, ECF #89-2 at Pg. ID 1027.) When asked to identify a job in the Sign Department that would allow him to sit for at least four hours per day, Greiner could not definitively identify any such position. (*See* Greiner Dep. at 109, ECF #89-2 at Pg. ID 1028.) Instead all he could say was that "[i]f there was [such a position], it would have been *closest* [sic] being a laborer on the sign truck." (*Id.*; emphasis added.) But Greiner admitted that he did not know whether the sign truck assignment would allow him to sit for four hours "on a given day." (*Id.*)

to work below his normal classification if "properly-classified personnel are unavailable," (CBA at Article 10, ECF #90-2 at Pg. ID 1428), the CBA only envisioned that such an assignment be "temporary." (*See id.* at Article 31, ECF #90-2 at Pg. ID 1441).  Thus, Greiner's request to be permanently assigned to the sign truck would have violated his higher-classified co-workers' rights under the CBA by forcing them to cover Greiner's lower-classified work on a permanent basis.  This is not a reasonable accommodation. *See Steward*, 533 F. Supp. 2d at 722 (explaining that an accommodation is unreasonable if it will "force employers to . . . violate other employees' rights under the collective bargaining agreement").

Finally, Greiner contends that the MCRC could have accommodated his disability by "lower[ing] the chain on the [] post puller" and by welding extra steps on the side of their trucks." (*See id.* at 162-63, ECF #89-2 at Pg. ID 1041.)  Although such an accommodation may have allowed Greiner to pull posts more easily and enter trucks more comfortably, Greiner did not explain at his deposition or in his briefs how such accommodations would have allowed him to complete the *other* essential functions of a highway maintenance person, such as doing tasks that require standing for longer than four hours or lifting objects other than posts. (*See id.*; Greiner Resp. Br., ECF #103.)  Therefore, Greiner has failed to show that these accommodations would have rendered him qualified to perform his job. *See Johnson v. Cleveland City School Dist.*, 443 Fed. App'x 974, 983 (6th Cir. 2011) ("[T]he

disabled individual must prove that he or she would in fact be qualified for the job if the employer were to adopt the proposed accommodation.")

For the reasons above, Greiner has not established a genuine dispute of material fact as to whether he was could perform the essential functions of his job as a highway maintenance person with or without reasonable accommodations. Therefore, he was not a "qualified individual" under the ADA or PWDCRA, and the County and the Union are entitled to summary judgment on his failure to accommodate claim under the ADA and PWDCRA.[8]

## B

Next, Greiner asserts that the Union and the County violated the ADA and PWDCRA by terminating him on the basis of his disability.

Because Greiner has not put forth direct evidence of being terminated on the basis of his disability, his claims are governed by the *McDonnell Douglas* burden-shifting framework. *See Ferrari v. Ford Motor Company*, 826 F.3d 885, 891-97 (6th Cir. 2016). Under that framework, Greiner bears the initial burden of establishing a prima facie case of discrimination under the ADA or PWDCRA. To do so, Greiner

---

[8] Greiner's failure to accommodate claims against the Union fail for an additional reason. Greiner has not presented any evidence that the Union *itself* failed to accommodate his alleged disabilities. (*See* Sec. Am. Compl., ECF #46; Pl.'s Resp. Br., ECF #104.) Likewise, Greiner has not cited any case law suggesting that an employee may bring a failure to accommodate claim against his union based upon his *employer's* alleged failure to provide accommodations. (*See id.*)

must show that: (1) he is disabled; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) that he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *See id.* If Greiner establishes a prima facie case, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for terminating Greiner. *See id.* at 892. If Defendants provide such an explanation, then the burden shifts back to Greiner to show that Defendants' proffered explanation is a pretext for unlawful discrimination. *See id.*

Both the County and the Union are entitled to summary judgment on Greiner's discriminatory termination claims under the ADA and PWDCRA. Greiner cannot establish his prima facie case for such claims because, for the reasons explained above, he was not "otherwise qualified" for his position as a highway maintenance worker. (*See* Section IV-A-2, *supra*.) Greiner's prima facie case against the Union fails for the additional reason that it did not terminate his employment nor did it cause him to suffer any adverse employment action.[9]

---

[9] To the extent that Greiner is accusing the Union of not adequately representing him because of his disability, Greiner admitted at his deposition that he thought the Union would have treated him "the same way" even if he was not disabled. (Greiner Dep. at 244, ECF #90-55 at Pg. ID 1730.)

## V

In Count III of the Second Amended Complaint, Greiner alleges that Defendants violated the ADEA by terminating his employment on the basis of his age. (*See* Sec. Am. Compl. at ¶¶ 409-424, ECF #46 at Pg. ID 467-70.) Under the ADEA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). A plaintiff bringing a claim under the ADEA must "show that 'age was the but-for cause of the employer's adverse action.'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Gross v. FBL Fin. Servs.*, 557 U.S. 162, 177 (2009)).

Greiner fails to put forth direct evidence of age discrimination, and therefore, the claim is governed by the *McDonnell Douglas* burden-shifting framework described above. *See id.* To establish a prima facie case of age discrimination Greiner must show that: "(1) he was at least at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was [either] replaced by a younger worker" or treated less favorably than a similarly-situated non-protected worker. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, at 521-22. If Greiner establishes his prima facie case, the burden shifts to Defendants to put forth evidence

of a legitimate, non-discriminatory reason for the adverse employment action. *See id*. at 521. If Defendants can provide such a reason, the burden shifts back to Greiner to show that the proffered reason is a pretext for unlawful discrimination. *See id.*

Greiner's ADEA claim fails because he has not shown that he was otherwise qualified for his position as a highway maintenance person. As discussed above with respect to Greiner's claims under the ADA and the PWDCRA, Greiner's functional limitations prevented him, with or without reasonable accommodations, from being able to complete the lifting and standing tasks that are essential to his job as a highway maintenance person. (*See* Section IV-A-2, *supra*.)

Even if Greiner was able to establish a prima facie case of age discrimination, his claim would still fail. The County puts forth a legitimate, non-discriminatory reason for terminating Greiner: his repeated insubordination and poor performance as a highway maintenance person in the Sign Department. Greiner has not shown that this reason was pretext for age-based discrimination. The only possible evidence of age-based animus that Greiner identifies are stray comments about his age by Sabaugh, Pulizzi, and Balinski, none of whom were the decision-makers in Greiner's termination.[10] At the pretext stage, "statements by non-decision makers .

---

[10] Greiner testified that Sabaugh commented that because Greiner "was old," he (Sabaugh) was doing Greiner a favor by assigning him custodial duties. (Greiner Dep. at 168, ECF #89-2 at Pg. ID 1042.) Greiner could not recall any other age-related comments by Sabaugh. (*See id.*) In addition, Greiner testified that Pulizzi called him an "old piece of shit" and that Balinski accused him of "trying to

. . cannot suffice to satisfy the plaintiff's burden of demonstrating [age-based] animus." *Rosenthal v. Faygo Beverages, Inc.*, --- Fed. App'x ----, 2017 WL 3014431, at *5 (6th Cir. July 17, 2017) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 550 (6th Cir. 2004)). And there is no evidence that Hoepfner and Bathanti, the two individuals who made the ultimate decision to fire him, shared these views or made similar comments. Indeed, Greiner fails to point the Court to any evidence that age was even considered by Hoepfner or Bathanti when they made the decision to terminate him, let alone evidence that Greiner's age was the "but for" cause of his termination. *Blizzard v. Marion Tech. Coll.*, 698 F.3d at 283.

Greiner's age discrimination claim against the Union also fails because the Union did not terminate Greiner's employment. Moreover, Greiner admitted that the Union "didn't target me because of my age." (Greiner Dep. at 242, ECF #90-55 at Pg. ID 1729.) Greiner also confirmed that the Union would have likely treated him exactly the same way even if he was 39 years old. (*See id.* at 243, ECF #90-55 at Pg. ID 1729.) He has no age discrimination claim against the Union.

Thus, for all the reasons above, the County and the Union are entitled to summary judgment on Greiner's ADEA claim.

---

piggyback [him]self on everyone else," called him old, and said that he needed to get an operation to repair his knees. (*Id.* at 169, ECF #89-2 at Pg. ID 1043.)

## VI

In Count V of the Second Amended Complaint, Greiner alleges that Defendants violated his constitutional right to due process by denying him full and fair pre-termination and post-termination hearings. (*See* Sec. Am. Compl. at ¶¶ 430-34, ECF #46 at Pg. ID 472-73.)   Greiner seeks relief under 42 U.S.C. § 1983 ("Section 1983").   The Court finds that Greiner received all the pre- and post-termination due process required under the Constitution.

The "root requirement" of due process of law is "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest." *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971) (emphasis in original). "The pre-deprivation process need not always be elaborate, however; the amount of process required depends, in part, on the importance of the interests at stake." *Leary v. Daeschner*, 228 F.3d 729, 742-43 (6th Cir. 2000).   "Moreover, the sufficiency of pre-deprivation procedures must be considered in conjunction with the options for post-deprivation review; if elaborate procedures for post-deprivation review are in place, less elaborate pre-deprivation process may be required." *Id.*

In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985)*,* the Supreme Court explained how these principles apply to the termination of a public employee who has a protected property interest in continued employment.   The Supreme Court held that before a public employer may fire such an employee, the

employer must provide notice and "some kind of hearing." *Id*. at 542. The hearing need not be "elaborate," but it must provide the employee with "oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 545-46. In addition, at "the pre-termination stage, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decision maker." *Farhat v. Jopke*, 370 F.3d 580, 595-96 (6th Cir. 2004).

Greiner received sufficient pre-termination process. Before each of the three *Loudermill* hearings, he received written notice of the charges against him, and he had an opportunity to present his side of the story at each hearing. (*See* Greiner Dep. at 138, 191, 194-97, ECF #89-2 at Pg. ID 1035, 1066-68.) At the Third *Loudermill* hearing, Greiner even had an opportunity to present evidence to the County about proper flagging practices. (*See id.* at 197-98, ECF #89-2 at Pg. ID 1068.) In addition, union representatives spoke on behalf of Greiner at each hearing. (*See id.* at 146-47, 189-90, 195, ECF #89-2 at Pg. ID 1037, 1066-67.) And at the Third *Loudermill* hearing, Greiner had the opportunity to attack (and did attack) the credibility of his co-workers and supervisor (who accused him of the misconduct at issue) by claiming that they were fabricating charges against him to cover up their overtime fraud. (*See id.* at 147-148, ECF #89-2 at Pg. ID 1037.) The Court finds that the above-described

procedures were sufficient to satisfy the pre-termination due process requirements described in *Loudermill*.

Moreover, Greiner's specific complaints about his pre-termination procedures lack merit. For instance, he complains that the decision maker at the *Loudermill* hearings "was not impartial." (Greiner Dep. at 188, ECF #89-2 at Pg. ID 1066.) But the Constitution does not require that a pre-termination hearing have an impartial or neutral decision maker. *See Farhat*, 370 F.3d at 595-96.

Greiner further complains that County was unwilling to (1) separate his former co-workers into different rooms, (2) have the co-workers sign affidavits regarding their interactions with Greiner, and (3) turn those affidavits over to him. (*See* Pl.'s Resp. Br., ECF #103 at Pg. ID 2373.) But Greiner cites no authority that suggests the County was required to take such measures. (*See id.*)

Greiner also complains that the County failed to disclose evidence to him prior to the *Loudermill* hearings. (*See id.* at 191, ECF #89-2 at Pg. ID 1066). But he never identifies any specific evidence used against him at the hearings that the County failed to disclose, nor does he explain how any alleged non-disclosure unfairly prejudiced him at the hearings. (*See id.*) Greiner had ample advance notice of the charges against him, and he knew that the charges arose from complaints lodged by his co-workers and supervisors and that they would be the key witnesses against

him.  There was no unfair lack of disclosure here.  Simply put, Greiner's complaints about the pre-termination procedures are unfounded.

Likewise, Greiner has failed to show any shortcoming in his post-termination procedures.  He argues that the post-termination process available to him could not possibly have been sufficient because he never actually had a post-termination hearing.  But he ignores the post-termination procedures authorized under the CBA between the Union and the County.  The CBA permitted Greiner to file a grievance challenging his termination and permitted the Union to pursue binding arbitration of that grievance before a neutral decision maker. (*See* CBA at Article 9, ECF #90-2 at Pg. ID 1424-27.)  The Sixth Circuit has recognized that the availability of such arbitration proceedings under a CBA may satisfy post-termination due process requirements even where a union declines to proceed with the arbitration proceedings. *See Rhoads v. Bd. of Educ. Of Mad River Local Sch. Dist.*, 103 F. App'x 888, 897 (6th Cir. 2004) (explaining, in a case where a union declined to file an arbitration claim allowed under the CBA, that "[t]he fact that the Union elected not to pursue arbitration on [the member]'s behalf does not amount to a deprivation of her right to due process by the [the state-actor defendant]").  Greiner has not explained how the County deprived him of post-termination process when the decision not to invoke such process was made by the Union.

Simply put, Greiner has failed to demonstrate inadequacy in the pre- or post-termination process that was available to him, and the Union and County are entitled to summary judgment on Greiner's constitutional due process claims.[11]

## VII

In Count VII of the Second Amended Complaint, Greiner alleges breach of contract claims against the Union and the County. (*See* Sec. Am. Compl. at ¶¶ 440-45, ECF #46 at Pg. ID 475-77.)  The claim against each Defendant fails for different reasons.

The Union is entitled to summary judgment on this claim because Greiner has not presented any evidence that the Union breached any specific provision of any contract between itself and Greiner.

Greiner's breach of contract claim against the County is pre-empted by Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.  That statute pre-empts any state-law claim that is "inextricably intertwined with consideration of

---

[11] Greiner's due process claim against the Union fails for an additional reason.  To recover under Section 1983, a plaintiff must show that his constitutional rights were violated by "a person acting under color of state law." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 995 (6th Cir. 1994).  Greiner has not presented any evidence that the Union acted under the color of state law.  Thus, the Union is entitled to summary judgment on Greiner's due process claim on this additional ground. *See Moore v. Int'l Bhd. of Elec. Workers Local 8*, 76 F. App'x 82, 83 (6th Cir. 2003) (affirming district court's dismissal of plaintiff's Section 1983 claim against a union because the union was not a state actor for purposes of Section 1983); *see also Messman v. Helmke*, 133 F.3d 1042, 1044 (7th Cir. 1998) ("In general, a union is not a state actor.").

the terms of a [collective bargaining agreement]," *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 592 (6th Cir. 2014), and, more specifically, bars individual union members from bringing state-law breach of contract claims based upon an employer's alleged breach of a collective bargaining agreement. *See Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004). Greiner cannot avoid the pre-emptive force of Section 301 by alleging that he entered into an individual employment contract with the County. *See Maushund v. Earl C. Smith Inc.*, 795 F.2d 589, 590-91 (6th Cir. 1986) (explaining that "the collective bargaining process prohibits [bargaining unit employees] from engaging in separate negotiations with the company and precludes any actions to enforce such an agreement."); *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 801 (6th Cir. 1990) ("[E]mployees covered by a CBA cannot rely upon the existence of a separate, individual employment contract giving rise to state law claims."). Accordingly, the County is entitled to summary judgment on Greiner's breach of contract claim.[12]

## VIII

In Counts VIII and IX of the Second Amended Complaint, Greiner alleges that the Union and the County engaged in a "concerted action" and "civil conspiracy" to "deprive [him] of his vested constitutional rights in his continued

---

[12] Nothing in the Second Amended Complaint or in Greiner's briefing suggests that Greiner is bringing a hybrid Section 301 claim alleging both that the County breached the CBA and that the Union breached its duty of fair representation.

employment and to bar him from exercising his opportunity to expose the wrongful behavior by his fellow employees and union brothers at a *Loudermill* Hearing, post *Loudermill* Hearing, and/or subsequent investigation." (Sec. Am. Compl. at ¶¶ 446-57, ECF #46 at Pg. ID 477-80.)

In *Marks One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 55 F. Supp. 3d 977, 988 (E.D. Mich. 2014), this Court described the elements of civil conspiracy and concerted action claims as follows:

> Under Michigan law, a civil conspiracy is defined as "a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means. In addition, to establish a concert-of-action claim, a plaintiff must prove that all defendants acted tortiously pursuant to a common design that caused harm to the plaintiff. For both civil conspiracy and concert of action, the plaintiff must establish some underlying tortious conduct."

*Id.* (quoting *Urbain v. Beirling*, 301 Mich. App. 114, 131-32, 835 N.W.2d 455 (2013)).

Greiner has not presented sufficient evidence to create a material factual dispute on his civil conspiracy and concreted action claims. Greiner speculates that Bathanti and Long (his union representative) held a meeting in which they conspired to terminate him, but Greiner admitted at his deposition that he did not actually know what Bathanti and Long spoke about at their meeting. (*See* Greiner Dep. at 275-76, ECF #90-55 at Pg. ID 1732-33.) Greiner also asserts, without supporting evidence,

that Bathanti and the Union entered into a "joint decision to keep [the overtime] fraud from ever becoming exposed at the *Loudermill* hearings." (*See* Greiner Dep. at 206, ECF #89-2 at Pg. ID 1070.)  But Greiner testified that union representatives encouraged him to pursue his rights under the CBA, including his right to raise any concerns he had about his co-workers' alleged overtime fraud scheme. (*See id.* at 198, ECF #89-2 at Pg. ID 1068.)  And Greiner *did* raise such concerns, both in a formal complaint to the County and at the Third *Loudermill* Hearing. (*See id.* at 147-48, 198, ECF #89-2 at Pg. ID 1037, 1068.)

Finally, in Greiner's response to Defendants' motions for summary judgment, he seems to concede that he has no actual evidence of Defendants' concerted action or civil conspiracy and that, instead, he is simply assuming the existence of joint action.  He asks: "Realizing that the union did not support me, how could I consider anything other than the fact that they were working together in a concert of action and a civil conspiracy … [?]" (*See* Greiner's Resp. Br., ECF #103 at Pg. ID 2371-72.)

In sum, Greiner has failed to present sufficient evidence that the Union and the County colluded in an effort to terminate him or prevent him from exposing his co-workers alleged overtime scheme.  Given this lack of evidence, the Union and the County are entitled to summary judgment on Greiner's civil conspiracy and concerted action claims.

## IX

In Count X of the Second Amended Complaint, Greiner brings a claim of intentional infliction of emotional distress (IIED) against each Defendant. (*See* Sec. Am. Compl. at ¶¶ 458-63, ECF #46 at Pg. ID 481-82.)

To establish a claim of IIED, a plaintiff must show the following elements: "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; (4) severe emotional distress." *Donahoo v. Master Data Ctr.*, 282 F. Supp. 2d 540, 556 (E.D. Mich. 2003) (citing *Roberts v. Auto-Owners Ins. Co.*, 384 N.W.2d 905, 908 (Mich. 1985)). "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quoting *Graham v. Ford*, 237 Mich. App. 670, 604 N.W. 2d 713, 716 (1999)).

The only conduct that Greiner complains of in his IIED claim against the County is his co-workers screaming obscenities and insults at him. (*See* Greiner Dep. at 208-210, ECF #89-2 at Pg. ID 1071; Pl.'s Resp. Br., ECF #104 at Pg. ID 3186.) The Court finds that the insults by Greiner's co-workers, although mean, were "not so outrageous in character or so extreme in degree . . . as to be utterly intolerable in a civilized community." *See id.* ("Liability does not extend to mere insults,

indignities, threats, annoyances, petty oppressions, or other trivialities."). Thus, the County is entitled to summary judgment on Greiner's IIED claim.

According to Greiner, the Union intentionally caused him emotional distress because it declined to arbitrate all of his grievances and because Long allegedly lied at a hearing before the MERC. (*See* Greiner Dep. at 344-46, ECF #90-55 at Pg. ID 1736.) In Greiner's response to the Union's motion for summary judgment, he does not identify any other actions by the Union that caused him to suffer emotional distress. (*See* Pl.'s Resp. Br., ECF #104.) The Court does not find that either the Union's refusal to arbitrate his grievances or Long's allegedly false testimony is conduct so outrageous or extreme as to find the Union liable for IIED. Greiner cites no case law to the contrary. Accordingly, the Union is entitled to summary judgment on Greiner's IIED claim.

# X

Finally, Greiner alleges in the Second Amended Complaint that Defendants retaliated against him for exercising his rights under the First Amendment to the United States Constitution. (*See* Sec. Am. Compl. at ¶¶ 435-36, ECF #46 at Pg. ID 473.) Specifically, Greiner alleges that:

> Plaintiff's reporting of overtime fraud within his department constituted a protected activity, and his firing almost immediately thereafter, constituted a violation of [his] free speech under the First and Fourteenth Amendments [to] the United States Constitution.

(*Id.*at ¶435, ECF #46 at Pg. ID 473.) Greiner seeks relief under Section 1983. (*See id.* at ¶436.)

The Union is entitled to summary judgment on Greiner's First Amendment retaliation claim because he has not shown that the Union was a state actor for purposes of this claim under Section 1983. (*See* footnote 11, *supra.*)

However, the County is not entitled to summary judgment on Greiner's First Amendment retaliation claim because the County neglected to address that claim in its motion for summary judgment and corresponding brief. (*See* County's Mot., ECF #89.)

Rather than moving directly to trial on Greiner's First Amendment retaliation claim against the County, however, the Court believes that the best course of action is to (1) provide the County with opportunity to file a second motion for summary judgment that addresses the First Amendment retaliation claim and (2) provide Greiner with opportunity to respond to that motion. Accordingly, with respect to Greiner's First Amendment retaliation claim, the County's motion for summary judgment is denied without prejudice.

## XI

At the end of the Union's motion for summary judgment, it asks the Court to sanction Greiner for pursuing frivolous claims in violation of Rule 11 of the Federal Rules of Civil Procedure. (*See* ECF #90 at Pg. ID 1408-09.) This request is denied

without prejudice because Rule 11 states that a "motion for sanctions must be made separately from any other motion." Fed. R. Civ. P. 11(c).  If the Union would like to pursue sanctions against Greiner, it must file a separate motion that complies in all respects with the requirements of Rule 11.

## XII

For the reasons above, it is hereby ordered that:

- The Union's motion for summary judgment (ECF #90) is **GRANTED**.

- The Union's request for sanctions against Greiner is **DENIED WITHOUT PREJUDICE**.

- The County's motion for summary judgment (ECF #89) is **DENIED WITHOUT PREJUDICE** with respect to Greiner's First Amendment retaliation claim (as pleaded in paragraphs 436-37 of the Second Amended Complaint). With respect to Greiner's remaining claims, the County's motion for summary judgment (ECF #89) is **GRANTED.**

- If the County chooses to file a second motion for summary judgment addressing Greiner's First Amendment retaliation claim, it shall fill that motion by no later than October 10, 2017.  Greiner shall file a response by no later than October 31, 2017, and Defendants shall have until November 8, 2017 to reply.

- Greiner's Motion for Reconsideration (ECF #115), in which he asks the Court to reconsider its order regarding his audio recordings, is **DENIED** because he has not demonstrated a palpable defect by which the Court has been misled nor shown that correcting such a defect (if it exists) will result in a different disposition of the case. *See* E.D. Mich. L.R. 7.1(h).

**IT IS SO ORDERED.**


s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 11, 2017

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 11, 2017, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(810) 341-9764